681 So.2d 480 (1996)
STATE of Louisiana
v.
Kevin Dane THAMES.
No. 95 KA 2105.
Court of Appeal of Louisiana, First Circuit.
September 27, 1996.
*482 Dan Grady and Cassandra Butler, Livingston, for State of Louisiana.
James P. Manasseh, Baton Rouge, for Defendant-Appellant.
Before SHORTESS and LeBLANC, JJ., and TANNER[1], J. Pro Tem.
SHORTESS, Judge.
Kevin Dane Thames (defendant) was charged by grand jury indictment with the second degree murder, La. R.S. 14:30.1, of his wife, Sonia Michelle Thames (the victim) on October 23, 1992. He pleaded not guilty and not guilty by reason of insanity. A sanity commission found he was competent to stand trial. After trial by jury, defendant was found guilty as charged and was sentenced to life imprisonment with the Department of Corrections without probation, parole, or suspension of sentence, with credit for time served. After the trial court denied defendant's motion for new trial, defendant appealed, urging eight assignments of error.

*483 FACTUAL BACKGROUND
According to defendant, his marriage to the victim was beset by financial and emotional difficulties. He testified his wife wrote checks on their joint bank account in excess of the balance to such an extent he was forced to have her removed as a signatory on the account. Defendant's brother-in-law, Steve Knox, characterized the victim as "mentally cruel" to defendant, as well as "lazy." Several witnesses testified defendant took care of the couple's two children and did most of the cooking and cleaning, although defendant worked and the victim did not.
On approximately October 11, 1992, the victim left the marital domicile, taking the two children with her. She filed suit for separation, and defendant filed forgery charges against her for signing his name on checks, resulting in overdrafts. The victim returned home on Monday, October 19, and through Wednesday their relationship was harmonious. On Thursday, October 22, the couple went before a notary public and signed documents "waiving" the separation. But when defendant came home from work that evening, the victim was gone. She returned about 9:30 p.m.
The only version of what happened thereafter is defendant's, which is as follows. The victim was drunk when she returned home. She said she had gone to a sign language class (defendant and their oldest child are hearing impaired) and then to a few bars. They practiced signing for a while, then had consensual sex. Immediately afterward, the victim went into the living room and began making a list of the property she intended to take when she moved out. Defendant was shocked and begged her not to leave. She then threatened to charge him with rape and child abuse.[2]
Defendant spent the rest of the night arguing with the victim and begging her not to leave. Finally she told him it was time for him to get ready for work. He got their daughter ready for school and put her on the school bus. He made his lunch, got his hard hat, gloves, drill, and extension cord from the bedroom, and went to his car. He placed everything in the car but the extension cord. He went back into the living room and again begged her to stay. She cursed at him and told him to leave.
He remembered nothing between that point and getting up off his knees. The extension cord was wrapped around her neck, and she was not breathing. He put the body in the trunk of the car and went to work. That night he called the victim's best friend and asked if she had seen her, and the following day he filed a missing person report in which he told police his wife had acted strangely and then left walking west on Highway 1019 toward the town of Watson. That afternoon he drove around for hours looking for her. He stopped at a store and called his father, who told him he was suspected of murdering his wife. He then remembered the body in the trunk. He deposited the body about twenty-five feet off Misty Lane in Livingston Parish, where it was discovered a few hours later. Defendant confessed to Denham Springs sheriff's deputies that night.

ASSIGNMENTS OF ERROR NOS. 1 AND 2
The State's first witness was Michael K. Lanier, the Livingston Parish sheriff's deputy who took the missing person report from defendant. Lanier testified without objection regarding the circumstances surrounding his taking the report and the information given to him by defendant. The State introduced the report itself into evidence over defendant's objection. Defendant then moved for a mistrial, which was denied.
Defendant contends the trial court erred in admitting the report and in failing to grant a mistrial because (1) the report was not produced in response to defendant's discovery request under Louisiana Code of Criminal Procedure article 718, and (2) notice of intent to use the report, which defendant contends was inculpatory, was not given as *484 required by Code of Criminal Procedure article 768.
Upon the defendant's motion, the district attorney is required to permit the defendant to inspect and examine any documents which are intended for use by the State as evidence at trial. La.C.Cr.P. 718. Defendant moved for inspection of all documents intended for use at trial, by the State, but the missing person report was not produced.
Unless the defendant has been granted pretrial discovery, the State must give the defendant written notice prior to the State's opening statement that it intends to use an inculpatory statement made by the defendant. If such notice is not given, the inculpatory statement "shall not be admissible in evidence." La.C.Cr.P. art. 768. An "inculpatory statement" under this article is one made out of court after a crime has been committed, admitting a fact, circumstance, or involvement which tends to establish guilt or from which guilt may be inferred. State v. Quimby, 419 So.2d 951, 956 (La.1982); State v. Washington, 533 So.2d 989, 992 (La.App. 1st Cir.1988). Defendant contends the missing person report is an inculpatory statement because it tends to show guilty knowledge and an attempt to cover up the crime.
Failure of the State to comply with discovery procedures does not automatically command reversal. State v. Sweeney, 443 So.2d 522, 527 (La.1983). The purpose of giving a defendant sufficient notice of an inculpatory statement or any other evidence the State intends to use is to give the defendant a fair opportunity to meet the issue. If a defendant is misled by State responses relative to its possession of an inculpatory statement or other evidence, is lulled into a misapprehension of the strength of the State's case, and suffers prejudice when the evidence is subsequently introduced at trial, basic unfairness results, which constitutes reversible error. See State v. Jackson, 450 So.2d 621, 630 (La.1984); State v. Leagea, 95-1210 (La.App. 1st Cir. 5/10/96), 673 So.2d 646, 651. The court must review the entire record and determine whether any prejudice may have resulted from the noncompliance which caused the jury to reach the wrong conclusion. State v. Ray, 423 So.2d 1116, 1119 (La.1982).
The State clearly failed to comply with defendant's discovery request for any evidence the State intended to use at trial in violation of article 718. Assuming the report was inculpatory, the State also violated article 768. After reviewing the entire record, however, we find admission of the report was not prejudicial to defendant. Defendant did not object to Lanier's testimony regarding the substance of the report, and defendant himself testified he told police his wife was missing. The report was merely cumulative of this testimony. Furthermore, defendant has not shown any way in which he was misled as to the strength of the State's case. For these reasons, we find no merit in these assignments of error.

ASSIGNMENT OF ERROR NO. 3
Defendant contends the trial court erred in restricting the scope of cross-examination of Dr. Keith R. Mack. The State qualified Mack, the Livingston Parish Coroner, as an expert in internal medicine.[3] He assisted with the autopsy and testified on direct examination regarding the cause of the victim's death. As coroner, Mack was also a member of the sanity commission appointed by the court to determine whether defendant was competent to stand trial. On cross-examination, defendant's counsel attempted to question Mack about the sanity hearing. The prosecutor immediately objected. The court sustained the objection, advising defense counsel: "If you want him to testify, you can qualify him [as an expert in psychiatry] and call him as your own witness. He hadn't been qualified and he didn't testify on direct examination for anything about that." Defendant's counsel replied: "No, sir, I won't call him. I've got my own expert."
Defendant contends this restriction on his cross-examination of Mack infringed on his rights under Louisiana Constitution article 1, § 16, and Louisiana Revised Statute 15:273 *485 to confront and cross-examine the witnesses against him and his right to wide-open cross-examination under Louisiana Code of Evidence article 611(B).
An accused has the right to confront and cross-examine the witnesses against him, but that right is not unlimited or absolute. State v. Ware, 345 So.2d 33, 36 (La.1977); State v. Donald, 440 So.2d 862, 866 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1126 (La.1984). The law is well settled that the scope of cross-examination is not limited to matters covered in direct examination; a witness may be cross-examined upon the whole case. State v. Brown, 395 So.2d 1301, 1315 (La.1981); State v. Morgan, 367 So.2d 779, 782. (La.1979). However, the scope and extent of cross-examination rest largely in the discretion of the trial court, and its rulings will not be disturbed absent an abuse of discretion. State v. Garrison, 400 So.2d 874, 878 (La.1981); State v. Brooks, 94-1031 (La.App. 5th Cir. 5/30/95), 656 So.2d 772, 776; State v. Robins, 499 So.2d 94, 98 (La.App. 1st Cir.1986).
In this case, the trial court refused to allow defendant to question the State's expert on a matter outside the area of expertise for which he had been called. Defendant was not deprived of the opportunity to confront Mack; he had the opportunity to crossexamine Mack fully on any factual matter and on any matter within his expertise as a doctor of internal medicine. Furthermore, defendant had the option of calling Mack as an expert witnesses during his case, and he made the tactical decision not to do so. We find the trial court did not abuse its discretion in limiting defendant's cross-examination to those matters within the scope of the field of expertise for which he had been qualified.

ASSIGNMENT OF ERROR NO. 4
Alva Snelling testified as an expert in clinical social work. He opined defendant was not sane at the time he killed the victim but was experiencing a brief reactive psychosis. During cross-examination of Snelling, the State introduced the reports of the sanity commission members, Mack and Dr. Francisco A. Silva, a psychiatrist. Snelling had reviewed those reports and the transcript of the sanity hearing in formulating his opinion. During redirect examination, defendant attempted to elicit testimony from Snelling regarding Mack and Silva's testimony, but the trial court sustained the State's hearsay objection. Defendant contends the trial court erred in restricting his redirect examination.
Code of Evidence article 611(D) provides in pertinent part: "A witness who has been cross-examined is subject to redirect examination as to matters covered on crossexamination and, in the discretion of the court, as to other matters in the case." The trial court has great discretion in controlling redirect examination, and its rulings will not be overturned absent an abuse of that discretion. State v. Chapman, 410 So.2d 689, 703 (La.1981).
The trial court's exclusion of Snelling's testimony regarding Mack's and Silva's testimony was based on hearsay. Our supreme court has recently ruled otherwise inadmissible hearsay may be admitted in a criminal trial if it is reliable, trustworthy, and relevant and its exclusion would compromise the defendant's right to present a defense. State v. Van Winkle, 94-0947, p. 6 (La.6/30/95), 658 So.2d 198, 202.
During its cross-examination of Snelling the State introduced the reports of Silva and Mack made for the sanity hearing. The reports were admitted pursuant to Revised Statute 15:425, which provides such reports shall be prima facie evidence of the facts recited therein. Both doctors opined in their reports that defendant was capable of standing trial. Defendant was permitted to fully examine Snelling on redirect as to whether he agreed with Silva's and Mack's reports. He was also permitted to give his opinion of those doctors' competency to make such judgments. He was not permitted, however, to state what those doctors said at the sanity hearing that was not included in their reports.
Based on defendant's brief, we gather defendant wanted Snelling to testify Silva and Mack said defendant did not intend to kill his wife. Defendant asserted two alternative, but inconsistent, defenses: (1) he suffered a *486 brief reactive psychosis and was not sane at the time he committed the homicide; or (2) if he was sane, the homicide was committed in the heat of passion, and thus he was guilty only of manslaughter. We assume defendant made a strategic decision not to call Mack and Silva.
Defendant's right to attempt to convince the jury he committed manslaughter rather than second degree murder was not impermissibly impaired by the trial court's restriction of redirect to matters brought out on cross-examination. Defendant was not prevented from calling Silva or Mack during his own case. He simply chose not to do so. For these reasons, we find the trial court neither compromised defendant's fundamental right to present a defense nor abused its discretion in restricting defendant's redirect examination of Snelling.

ASSIGNMENT OF ERROR NO. 5
Defendant contends the trial court erred in finding him guilty of second degree murder in light of Snelling's testimony that defendant was temporarily insane due to a brief psychotic episode.
The law presumes a defendant is sane and responsible for his actions. La. R.S. 15:432. The defendant has the burden of establishing the defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652; State v. Peters, 94-0283, p. 8 (La.10/17/94), 643 So.2d 1222, 1225. The State is not required to offer any proof of the defendant's sanity or to offer evidence to rebut the defendant's evidence. Instead, the determination of whether defendant's evidence successfully rebuts the presumption of sanity is made by the trier of fact viewing all the evidence, including lay and expert testimony, the conduct of the defendant, and the defendant's actions in committing the particular crime. State v. Bell, 543 So.2d 1013, 1016 (La.App. 3d Cir.1989). The issue of insanity is a factual question for the jury to decide. State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32. Lay testimony concerning defendant's actions, both before and after the crime, may provide the jury with a rational basis for rejecting even unanimous medical opinion that a defendant was legally insane at the time of the offense. State v. Claibon, 395 So.2d 770, 773-74 (La. 1981).
In reviewing a claim of sufficiency of evidence in regard to a defense of insanity, we must apply the test set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant had not proven by a preponderance of the evidence he was insane at the time of the offense. State v. Peters, 94-0283, p. 8, 643 So.2d at 1225.
Defendant presented the testimony of Alva Snelling, a clinical social worker who presented impressive credentials in his field. The prosecution repeatedly emphasized to the jury, however, that he is neither a psychiatrist nor a psychologist. Snelling's opinion is based on three personal interviews with defendant, a personal interview with defendant's parents, and a telephone interview with defendant's father. These interviews began almost a year after the homicide.
Snelling stated defendant was raised in an extremely restrictive family environment by overprotective parents. As he grew up, he never overtly displayed anger but kept it inside. He had few friends and felt unloved by his parents, who had adopted him as a baby after their seven-year-old daughter was killed in an accident. The victim was the first woman who paid attention to him. When she rejected him the night of the homicide, all the anger in his life "reached critical mass." He was overwhelmed by repressed anger and experienced a "brief reactive psychosis" which left him unable to tell right from wrong for a short period of time.
During the interviews, defendant told Snelling that he did not remember killing his wife, that he was disoriented at work on that day, that when he gave the missing person report and drove around looking for his wife, he did not remember she was dead and hidden in the trunk of his car, and that he began to remember when his father told him he was a murder suspect. Defendant's testimony was in accord with Snelling's. Snelling *487 believed defendant's psychotic episode ended about the time he was arrested.
Snelling stated defendant's behavior immediately after his wife's death shows he did not know right from wrong. He opined a sane person would not drive to work with his dead wife in the trunk, nor would he dispose of the body at mid-afternoon in a wide open space. He also found defendant's actions in making a missing person report and driving around looking for her were evidence of psychosis. On cross-examination, however, Snelling admitted that if defendant had been sane, his actions in hiding the body, in filing a missing person report, and in dumping the body would indicate he knew he had done something wrong and was trying to cover it up.
Snelling's opinion defendant experienced a psychotic episode was also based on defendant's memory blackouts. The prosecutor questioned whether defendant may have had "selective advantageous amnesia," i.e., that he reported blackouts only to bolster his insanity defense. The State points to defendant's recorded confession given to police approximately thirty-six hours after the victim's death, in which defendant, although distraught, reports the facts surrounding the homicide in detail. Defendant testified he does not remember what happened between disposing of the body and the arrival of the police that night, but he suddenly remembered what he had done when he saw the police.
Based on these facts, we find a rational trier of fact could have found defendant failed to rebut the presumption of sanity by a preponderance of the evidence. Snelling's diagnosis is based on self-serving statements of the defendant given almost a year after the homicide. The facts which Snelling contends show "impaired reality" can just as easily be interpreted to show guilty knowledge through an attempt to hide the body and to direct attention away from himself in connection with her disappearance. That he drove to work with his wife's body in his trunk and dumped her body in a fairly open area during daylight hours can be interpreted as lack of an immediate plan to hide the corpse and quick disposal of it after his father advised him he was a murder suspect. Although the State put on no medical evidence to show defendant was sane at the time the homicide was committed, it was not required to do so as defendant had the burden of proof. For these reasons, we find this assignment has no merit.

ASSIGNMENT OF ERROR NO. 6
Defendant contends the jury's determination that he was guilty of second degree murder rather than manslaughter was "irrational" based on the facts of this case. Second degree murder is defined, in pertinent part, in Revised Statute 14:30.1(A)(1) as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm...." Manslaughter is defined, in pertinent part, in Revised Statute 14:31(A)(1) as:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed....
Defendant contends he was faced with provocation sufficient to deprive an average person of self-control and cool reflection when his wife threatened to charge him with rape and child abuse and cursed him when he begged her not to leave him, particularly in light of his emotional state after arguing and pleading with her all night.
"Heat of blood" and "sudden passion" are not elements of the offense of manslaughter but are factors in the nature of mitigating circumstances which may reduce the grade of homicide. State v. Tompkins, 403 So.2d 644, 648 (La.1981); State v. Riley, 91-2132R, p. 10 (La.App. 1st Cir. 5/20/94), 637 So.2d 758, 763. Provocation is a question of fact to be determined by the trier of fact. State v. Riley, 91-2132R, p. 10, 637 So.2d at *488 763. The issue on appeal is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 111 (La.1986).
There was no testimony to corroborate defendant's statements that the victim threatened to charge him with child abuse and rape or that she cursed him when he begged her not to leave him. Even if the jury believed him, defendant testified the threats were made that night, and the homicide did not occur until time for him to leave for work the next morning. Revised Statute 14:31 requires the provocation to have occurred "immediately" before the offense. Snelling's testimony was directed toward showing defendant did not know what he was doing due to psychosis rather than showing he acted through sudden passion or heat of blood.
The jury heard defendant's taped statement in which he said he panicked because he did not want her to leave with his children. The jury also heard his testimony that he got the extension cord from the bedroom, went to his car carrying the cord and other work equipment, then returned to the living room with the cord. He was in enough emotional control to pack his lunch, to get himself ready for work and his daughter ready for school, and to make sure she got on the school bus.
A rational trier of fact, applying a Jackson v. Virginia standard, could have concluded the mitigating factors which reduce the degree of homicide from murder to manslaughter were not present in this case. Thus, this assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 7 AND 8
Defendant contends the trial court erred in failing to instruct the jury regarding the mandatory life sentence for second degree murder. Defendant further contends the trial court erred in failing to grant his motion for post verdict judgment of acquittal or new trial based on its failure to give that jury instruction.
When the penalty imposed by statute is mandatory, the trial court must inform the jury of the penalty if the defendant properly requests a special written charge in accordance with article 807 of the Code of Criminal Procedure. State v. Washington, 367 So.2d 4 (La.1978). There is no indication in the record defendant made such a request. In fact, the trial court commented during the hearing on the motion for new trial: "It's the court's opinion that instructions to the jury regarding the sentence [are] not necessary except in a case where the defendant may specifically request that it be done and I know of no request made in this case." (Emphasis added.)
Defendant also contends that during its deliberations, the jury sent a note to the judge asking to be advised of the penalty for second degree murder. Defendant further contends that without notifying defendant or his counsel, the judge sent written instructions back to the jury which did not include the requested information. The minutes and transcript are silent as to whether the jury requested further instructions, and what the judge's response was, if any. Thus there is nothing for us to review on appeal.
Code of Criminal Procedure article 851 provides in pertinent part: "The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded." Defendant has failed to show injustice has been done, and thus this assignment of error has no merit.

CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] According to defendant, before she left the previous week the victim had taken photographs of bruises of their daughter's leg and buttocks which were inflicted at the victim's friend's home when defendant was not present.
[3] Mack's medical specialty training was in ophthalmology, and he testified if he were not the coroner, he would be in a general medical practice.