# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

### 2023 KA 0699

STATE OF LOUISIANA

VERSUS

COURTNEY GARNETT

Judgment Rendered: **FEB 2 1 2024**

\* \* \* \* \* \*

On Appeal from the Seventeenth Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Docket No. 577581

Honorable Marla M. Abel, Judge Presiding

\* \* \* \* \* \*

Kristine Russell                          Counsel for Appellee
District Attorney                         State of Louisiana
-and-
Jason Chatagnier
Gregory Stahlnecker
Joseph S. Soignet
Assistant District Attorneys
Thibodaux, Louisiana


Kevin V. Boshea                           Counsel for Defendant/Appellant
Metairie, Louisiana                       Courtney Garnett

\* \* \* \* \* \*

**BEFORE: McCLENDON, HESTER, AND MILLER, JJ.**

**McCLENDON, J.**

Defendant, Courtney Garnett, was charged by bill of information with attempted second degree murder (count one), a violation of LSA-R.S. 14:27 and LSA-R.S. 14:30.1, and aggravated battery (count two), a violation of LSA-R.S. 14:34. He initially entered a plea of not guilty. Upon motion of defendant, the trial court appointed a sanity commission to determine defendant's competency to stand trial. After a sanity hearing, the trial court found that defendant did not have the mental capacity to proceed. Defendant was committed to the Department of Health and Hospitals, reevaluated, and found competent to stand trial, but changed his plea to not guilty and not guilty by reason of insanity.

After a trial by jury, defendant was found guilty as charged on count one and guilty of the responsive offense of second degree battery on count two, a violation of LSA-R.S. 14:34.1. See LSA-C.Cr.P. art. 814(A)(18). The trial court denied a combined motion for new trial and motion for post-verdict judgment of acquittal filed by defendant and imposed a sentence of twenty-five years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, and a sentence of five years imprisonment at hard labor on count two, to be served concurrently. The trial court denied defendant's motion to reconsider sentence. Defendant now appeals, assigning error to the sufficiency of the evidence based on his defense of insanity, the constitutionality of the sentences, and the denial of his post-trial motions. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On June 26, 2018, at approximately 4:30 a.m., defendant physically attacked Jarius LeBlanc and Cade Legendre, two workers at Lafourche Parish Water District, in Thibodaux, Louisiana. Defendant initially approached Mr. LeBlanc, pulled him to the ground, got on top of him, and began stabbing him with a knife in the back, face, and neck. Mr. Legendre heard Mr. LeBlanc screaming for help and ran to assist him, at which point defendant charged toward Mr. Legendre, and started punching and kicking him. Mr. LeBlanc then went to his truck that was parked in the nearby lot, and grabbed his loaded pistol from between the driver's seat and middle seat. Defendant saw Mr. LeBlanc

2

at his truck, approached him from behind, pulled the gun away from him, and fired the gun at him, but missed. Defendant pulled the trigger again, but the gun did not fire. Defendant then walked away toward an open cane field. Mr. Legendre called 911. Defendant was located in a ditch by the field, taken into police custody, and confessed in a recorded interview.

## SUFFICIENCY OF THE EVIDENCE[1]

In assignment of error number one, defendant argues the verdicts are "irrational", maintaining that he proved by a preponderance of the evidence that he was insane at the time of the offenses. Thus, in assignments of error numbers three and four, respectively, he argues that the trial court erred in denying his motion for new trial and in failing to reject the jury's verdict and render a post-verdict judgment of not guilty and not guilty by reason of insanity.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, LSA-Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Welch**, 2019-0826 (La.App. 1 Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **Welch**, 297 So.3d at 27. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct

---

[1] In his motion for new trial, defendant argues that the verdicts are not supported by trial testimony and that the ends of justice would be served by the granting of a new trial. At the hearing on the post-trial motions, he argued the victims' injuries were not serious or life threatening. As he has not re-raised this argument on appeal, it is considered abandoned. See Uniform Rules of Louisiana Courts of Appeal, Rule 2-12.4. We further note that a motion for post-verdict judgment of acquittal is the proper procedural vehicle for raising the sufficiency of the evidence. See LSA-C.Cr.P. art. 821. A motion for a new trial challenging the sufficiency of the evidence is a question of fact outside of the higher courts' scope of review. But, a ruling on a motion for new trial on the ground of serving the ends of justice presents a question of law, which should not be disturbed on review unless the trial court abused its great discretion. **State v. Guillory**, 2010-1231 (La. 10/8/10), 45 So.3d 612, 615.

evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Coleman**, 2021-0870 (La.App. 1 Cir. 4/8/22), 342 So.3d 7, 12, writ denied, 2022-00759 (La. 11/21/23), 373 So.3d 460.

When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Southall**, 2022-0746 (La.App. 1 Cir. 6/2/23), 369 So.3d 925, 930, writ denied, 2023-00875 La. 2/6/24), ___ So.3d ___, 2024 WL 445884.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended, and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. LSA-R.S. 14:27(A). A specific intent to kill is an essential element of the crime of attempted murder.[2] **State v. Currie**, 2020-0467 (La.App. 1 Cir. 2/22/21), 321 So.3d 978, 982.

Second degree battery is a battery when the offender intentionally inflicts serious bodily injury. LSA-R.S. 14:34.1. A battery is the intentional use of force or violence upon the person of another. LSA-R.S. 14:33. Serious bodily injury is bodily injury which involves unconsciousness; extreme physical pain; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death. LSA-R.S. 14:2(C). Second degree battery is a

---

[2] Although LSA-R.S. 14:30.1, the statute for the completed crime of second degree murder, allows for a conviction based on "specific intent to kill or to inflict great bodily harm," attempted second degree murder requires specific intent to kill. **State v. Bishop**, 2001-2548 (La. 1/14/03), 835 So.2d 434, 437.

4

crime requiring specific criminal intent. <u>See</u> **State v. Kitchen**, 2017-0362 (La.App. 1 Cir. 9/15/17), 231 So.3d 849, 855, <u>writ denied</u>, 2017-1983 (La. 11/14/18), 256 So.3d 281.

Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances.[3] Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **Currie**, 321 So.3d at 983.

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. LSA-R.S. 15:432; **State v. Harris**, 99-0820 (La.App. 1 Cir. 2/18/00), 754 So.2d 304, 308. To rebut the presumption of sanity and avoid criminal responsibility, a defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. LSA-C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. LSA-R.S. 14:14. The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and actions before and after the crime, should be reserved for the factfinder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. **State v. Mitchell**, 2016-0834 (La.App. 1 Cir. 9/21/17), 231 So.3d 710, 732, <u>writ denied</u>, 2017-1890 (La. 8/31/18), 251 So.3d 410. The most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime. **Mitchell**, 231 So.3d at 735.

---

[3] Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **Southall**, 369 So.3d at 930.

5

The State is not required to offer any proof of the defendant's sanity or to offer evidence to rebut the defendant's evidence. Instead, the determination of whether the defendant's evidence successfully rebuts the presumption of sanity is made by the trier of fact viewing all the evidence, including lay and expert testimony, the conduct of the defendant, and the defendant's actions in committing the particular crime. Lay testimony concerning the defendant's actions, both before and after the crime, may provide the jury with a rational basis for rejecting even unanimous medical opinion that a defendant was legally insane at the time of the offense. **Harris**, 754 So.2d at 308. When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by the appellate court is whether or not any rational factfinder, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. **Mitchell**, 231 So.3d at 732.

Mr. LeBlanc and Mr. Legendre did not know defendant before June 26, 2018, and were the only workers present at Lafourche Parish Water District that morning. They had gone in opposite directions from each other to collect water samples just prior to the incident. As Mr. LeBlanc testified, around 4:30 a.m., while he was cleaning his boots, defendant grabbed Mr. LeBlanc's shirt collar, pulled him to the ground, and got on top of him. Mr. LeBlanc felt pain in his back, neck, face, and the rest of his body. He was unable to fight back since he was on his stomach, and defendant was on top of him. Defendant tried to keep Mr. LeBlanc from yelling by putting his hand over Mr. LeBlanc's mouth. Mr. LeBlanc bit defendant's hand so he could yell for help. Defendant, in turn, grabbed Mr. LeBlanc's hand and bit him. Responding to Mr. LeBlanc's cries, Mr. Legendre hollered at defendant to get his attention. Defendant then got off of Mr. LeBlanc and started attacking Mr. Legendre. Mr. Legendre testified that defendant pushed him to the ground and then tripped over Mr. Legendre's leg. Mr. Legendre tried to grab defendant, but defendant kicked him hard in the face, causing him blurred vision and a loss of equilibrium. Defendant halted his attack of Mr. Legendre when he saw Mr. LeBlanc at his truck. After wrestling for control over the gun, defendant threw Mr. LeBlanc to the

6

ground, stood over him with the gun, fired and missed, and tried to shoot him again, but the gun was out of ammunition.[4] Mr. LeBlanc suffered stab wounds and nerve damage to the back of his neck, lip, and chin. Mr. Legendre suffered two broken teeth.

Deputy Robin Naquin, a former patrol deputy for the Lafourche Parish Sheriff's Office (LPSO), was the first officer who arrived on the scene at around 4:40 a.m. She observed blood on the ground and a shell casing from a semi-automatic handgun. Deputy Naquin then saw Mr. LeBlanc, who had suffered facial injuries and was wearing a blood-drenched uniform shirt. She also found Mr. Legendre. Mr. LeBlanc and Mr. Legendre pointed toward a fence bordering the property, and Mr. Legendre told Deputy Naquin that defendant was headed in that direction. Deputy Naquin took photographs of the area and of the victims and set up a perimeter.

LPSO Deputy Anthony Paul Borne, Jr. was dispatched to the incident at 5:00 a.m., and while patrolling on foot by the cane field looking for defendant, he observed defendant lying in an irrigation ditch. He pointed his firearm at defendant and commanded him to show his hands, and defendant surrendered. Defendant was wet, shirtless, and covered in mud. Deputy Borne noted that defendant was compliant, calm, and quiet when taken into custody. LPSO Deputy Blake Thibodeaux located defendant's shirt near the fence line.

Sergeant Robert Mason, a crime scene investigator with the LPSO, was dispatched to the scene at approximately 5:30 a.m. He photographed defendant, who was in custody in the back of a police unit at the time and observed that defendant was muddy and had dried blood and injuries on his hands. Sergeant Mason also took photos of the scene and of Mr. Legendre, observing blood on Mr. Legendre's shirt, hand, arms, and bloodstains on his top right shoulder. No pictures were taken of Mr. LeBlanc's injuries, as he had already been transported to Thibodaux Regional Medical Center. Sergeant Mason further located, photographed, and collected a nine-millimeter shell casing and photographed the blood on the ground in the parking lot. He also photographed Mr. LeBlanc's truck, noting there was a pooling of blood at the base of the driver's seat, blood on the edge of

---

[4] Just before Mr. LeBlanc lost control of the gun, he pressed the button on the pistol grip to release the magazine, leaving only one bullet in the firearm.

the seat cushion, and blood smeared alongside the truck. Sergeant Mason recovered the firearm, a Glock model 19, located approximately 300 to 350 feet from the parking lot. Sergeant Mason also located a knife in the grass near the area of the crime, which he photographed and collected.

After responding to the scene, LPSO Detective Joseph Anderson went to the hospital where he observed and photographed Mr. LeBlanc's injures. Detective Anderson also took a recorded statement from defendant, who had been transported to the hospital for treatment of cuts and marks on his fingers. After being advised of his **Miranda**[5] rights, defendant agreed to participate in the interview, which was later played at trial in the presence of the jury. Early in the interview, defendant was asked what was wrong or what happened, and responded, "Y'all was after me!" Defendant further stated that he was "freaking out" because police officers were following him in unmarked cars and were trying to kill him, and he thought the victims at the plant were police officers.[6] Defendant indicated that the first victim (Mr. LeBlanc) started fighting back, declaring that he "killed" him with a knife. Defendant stated that he got the knife from his aunt's house, but refused to provide her name or address. He confirmed that he took Mr. LeBlanc's gun because Mr. LeBlanc would have killed him with it, and he noted that he tried to shoot Mr. LeBlanc but missed. Defendant denied taking any drugs or being "diagnosed with anything." Defendant refused to give a blood sample or allow a DNA swab to be taken, stating that he wanted to confer with a lawyer first. When asked if he wanted to stop talking and wait for his attorney, defendant stated he would talk, but specifically noted that he had the right to answer or not answer questions. He confirmed the location of the gun, noting that he threw it under the fence when he ran into the field. Defendant did not testify at trial.

---

[5] **Miranda v. Arizona**, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[6] Detective Anderson testified that he learned defendant was involved in a prior incident at the hospital wherein he approached two people in the parking lot. Defendant reportedly asked the individuals to pray with him and threatened to cut or harm himself. Detective Anderson testified that he believed defendant was trying to get away from the police at the time of the instant offenses, because he thought he was in trouble for the prior incident. When asked about the prior incident during the interview, defendant stated that he did recall it, but would rather not discuss it because it was "personal."

8

Defendant's father, Kenneth Garnett, testified at trial. Mr. Garnett testified that defendant was an outstanding high school athlete and received a scholarship to play college football at the University of Oklahoma. He noted that defendant's behavior began to change when he injured his knee, which required surgery. Mr. Garnett testified that he and defendant's mother each separately stayed with defendant on campus for a month at a time in an attempt to get defendant back on track with school and to prevent him from losing his scholarship, to no avail. Mr. Garnett noted that defendant would not sleep regularly, that his behavior became aggressive over time, and that he was paranoid that someone would hurt him or his family. Mr. Garnett further testified that after losing his scholarship and having to leave school, defendant went to Grambling State University in Louisiana for about a month, but did not attend class or football practice, and after a month returned home.

According to Mr. Garnett's trial testimony, the day before the incident in question, defendant went to visit his aunts and grandmother in Thibodaux. While he was there, one of his aunts called Mr. Garnett and fearfully reported that defendant asked several people, including his aunt, to drink their blood in order to keep the family together. Mr. Garnett went to Thibodaux to talk to defendant, convinced him to get some rest, and made plans to take him to the hospital. However, after being informed that defendant left the house again, Mr. Garnett went to the police station in Thibodaux for their assistance. Mr. Garnett further testified that he told the police that he thought defendant might hurt himself or someone else and was not in his right mind. While at the station, Mr. Garnett heard over the radio that a large man was at the hospital who was trying to commit suicide and was asking people to pray with him. Mr. Garnett told the police that the report was about defendant and that they needed to go get him. However, by the time the police arrived, defendant was no longer at the hospital. Mr. Garnett drove around Thibodaux for hours looking for defendant until he received a call from a detective about defendant's arrest for the instant offenses. Defendant went home after posting bail on August 16, 2018, and Mr. Garnett then took defendant to University Medical Center (UMC) in Orleans Parish.

9

Dr. Sarah DeLand, a board-certified forensic psychiatrist for twenty-eight years, testified as an expert in forensic psychiatry and general psychiatry. Dr. DeLand, along with two other doctors, Dr. Richard Richoux and Dr. Raphael Salcedo, evaluated defendant in October of 2018 as part of a court-appointed sanity commission to determine defendant's competency to stand trial. Dr. DeLand stated that they all agreed that defendant had a mental illness, was paranoid, and was not competent to proceed. The doctors recommended hospital treatment and competency restoration. Dr. DeLand explained that they all thought defendant had a schizophrenia spectrum disorder.[7] She stated that males who would develop schizophrenia or other similar disorders would do so typically in their late teens or early twenties. Dr. DeLand further testified that symptoms of schizophrenia include a problematic thinking process and that the most prominent symptoms are hallucinations, delusions (fixed false beliefs), paranoid beliefs, and moderate to severe thought disorganization. Dr. DeLand also testified that after seeing defendant as part of the sanity commission, she realized that she first assessed defendant on August 10, 2018, when Dr. DeLand conducted a brief interview of defendant for the coroner's office. At that time Dr. DeLand determined that defendant fit the criteria to continue his commitment at UMC, and she executed a coroner's emergency certificate.

Prior to the 2022 trial, defendant's attorney asked Dr. DeLand to evaluate defendant's state of mind at the time of the offenses. Dr. DeLand testified that defendant seemingly did not understand schizophrenia or want to be considered as having the condition. She stated he instead described himself as having anxiety and insomnia. She further testified that defendant had strong religious beliefs and excessively read the Bible, which led him to believe that he was the chosen one, and people needed to drink his blood to be saved. She explained that hyper-religious belief was common in schizophrenia, along with the failure to recognize having the illness.

Dr. DeLand noted that defendant's medical records detailed multiple episodes of paranoid beliefs with no evidence to warrant the beliefs. She testified that she reviewed defendant's medical records from Oklahoma, from UMC, and from the State Forensic

---

[7] Dr. DeLand described schizophrenia spectrum disorder as a blanket term for multiple different disorders sometimes made during initial evaluations as a diagnostic impression instead of a diagnosis because the classification can change as more is learned about symptoms and other factors.

Hospital in Jackson, where he was hospitalized for several months to restore his competency to stand trial. In reviewing the physician evaluations, Dr. DeLand did not see any indication that any of the doctors thought defendant was "malingering mental illness."[8]

When asked if marijuana use by defendant could explain his actions, Dr. DeLand testified that marijuana affects different people in different ways and confirmed that some individuals have psychotic symptoms relative to substance intoxication. However, she stated that in her opinion, while defendant did smoke marijuana, he also had a separate and serious psychotic illness. Dr. DeLand further believed that getting rid of the gun was consistent with defendant's paranoia as opposed to guilt. She noted that in his police statement, defendant sounded paranoid, as he kept saying the police were after him and out to get him. Dr. DeLand opined, taking all of the information into consideration, with reasonable medical certainty, that defendant was psychotic from his mental illness at the time of the offenses such that he was unable to distinguish right from wrong.

On cross examination, Dr. DeLand was asked if she reviewed defendant's UMC records, indicating that he gave a different account of the instant offenses and suggesting that the incident began over a verbal dispute and that the gun went off when he pulled it away from Mr. LeBlanc. While noting that defendant's account in the medical records was not completely consistent with the details given during his police interview, Dr. DeLand testified that, in her opinion, defendant was psychotic at the time of the incident and, thus, slightly differing accounts were not surprising. Dr. DeLand confirmed that she did not hear the testimony of Mr. LeBlanc or Mr. Legendre, though she saw their police statements. She admitted that it was not possible to provide an exact time that a psychotic episode starts or the exact time that it ends. Dr. DeLand further testified that while she could say that she believed defendant was having psychotic symptoms for a period of time leading up to the incident in question, she could not say exactly when those psychotic symptoms may have eased.

---

[8] Dr. DeLand defined "malingering" as the intentional production of symptoms of a medical nature.

When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **State v. Alexander**, 2014-1619 (La.App. 1 Cir. 9/18/15), 182 So.3d 126, 131, writ denied, 2015-1912 (La. 1/25/16), 185 So.3d 748. It is well settled that the trier of fact can accept or reject, in whole or in part, the testimony of any witness. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. **State v. Lavy**, 2013-1025 (La.App. 1 Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

In **State v. Dixon**, 2008-1038 (La.App. 1 Cir. 12/23/08), 2008 WL 6809594, *14 (unpublished), writ denied, 2009-0189 (La. 10/30/09), 21 So.3d 275, this court upheld convictions of two counts of attempted first degree murder and two counts of second degree kidnapping. In that case, Dr. DeLand testified that the defendant suffered from posttraumatic stress disorder (PTSD) and, due to the symptoms of the disease, was unable to distinguish right from wrong at the time of the offense. She stated therein that the defendant stabbed a baby, the child of the defendant's estranged wife and another man, while in five o'clock rush-hour traffic, in plain view of everyone, without any hope of significant escape, and also with a law enforcement vehicle very close by, which indicated unplanned, bizarre behavior. The defense also presented the testimony of Dr. Marc L. Zimmerman, a psychologist whose testing showed that the defendant had a low probability of malingering. Dr. Zimmerman indicated that the defendant had symptoms of or symptoms that could be PTSD. The defendant reported seeing things, hearing things, and memory difficulty. Testing by Dr. Zimmerman indicated that the defendant had anxious arousal, intrusive experiences, and depression. **Dixon**, 2008 WL 6809594 at *5. However, Dr. Donald Hoppe, a psychologist testifying as a State witness on rebuttal, was of the opinion that it was very questionable whether the defendant's combat experiences in Iraq would meet the guidelines for PTSD. **Dixon**, 2008 WL 6809594 at *6.

In affirming the convictions, this court considered Dr. Hoppe's testimony as well as the testimony of other State witnesses concerning the defendant's actions at the time of the offenses. While the defendant therein argued that he did not behave as someone

12

who understood that his conduct was wrong and should be concealed, this court found that the record indicated that he tried his best to kill both victims, successfully escaping from the crime scene after stabbing his estranged wife thirteen times and striking her with his car, and after cutting her child and leaving a knife stuck in the child's head. This court found that the defendant's medical history and the expert testimony at trial did not sufficiently establish that he was unable to distinguish between right and wrong at the time of the offenses. **Dixon**, 2008 WL 6809594 at *7.

In **State v. Thames**, 95-2105 (La.App. 1 Cir. 9/27/96), 681 So.2d 480, 488, writ denied, 96-2563 (La. 3/21/97), 691 So.2d 80, this court upheld a conviction of second degree murder based on the defendant killing his wife. In that case, the defendant presented the testimony of a clinical social worker, Alva Snelling, who stated that the defendant's behavior immediately after his wife's death showed he did not know right from wrong. He opined a sane person would not drive to work with his dead wife in the trunk, nor would he dispose of the body at mid-afternoon in a wide open space. He also found the defendant's actions in making a missing person report and driving around looking for her were evidence of psychosis. On cross-examination, however, Mr. Snelling admitted that if the defendant had been sane, his actions in hiding the body, in filing a missing person report, and in dumping the body would indicate he knew he had done something wrong and was trying to cover it up. This court noted that the defendant gave a recorded confession to the police approximately thirty-six hours after the victim's death, in which he, although distraught, reported the facts surrounding the homicide in detail. **Thames**, 681 So.2d at 486-87.

In affirming the conviction in **Thames**, this court held that a rational trier of fact could have found the defendant failed to rebut the presumption of sanity by a preponderance of the evidence. In doing so, this court noted that Mr. Snelling's diagnosis was based on self-serving statements of the defendant given almost a year after the homicide. While the State did not present any medical evidence to show that the defendant was sane at the time of the offense in that case, this court noted that it was not required to do so, as the defendant had the burden of proof. **Thames**, 681 So.2d at 487.

Herein, defendant notes that the State did not offer any expert witness to refute Dr. DeLand's testimony at trial. However, the State was not required to offer expert testimony to rebut defendant's evidence of insanity, as lay testimony may provide a rational basis for rejecting an expert opinion. See **Harris**, 754 So.2d at 308. Moreover, defendant had the burden of proving by a preponderance of the evidence that he was insane at the time of the offenses. See **Thames**, 681 So.2d at 487.

We note that while Dr. DeLand opined that defendant was unable to distinguish right from wrong when he committed the offenses, she then admitted that it was not possible to know when defendant's psychotic episode began and ended. Considering her testimony as a whole, as well as all of the other testimony presented at trial, we cannot say that the jury was irrational in rejecting Dr. DeLand's opinion.

Further, the evidence showed that defendant attacked the victims individually, after they went separate ways to perform their work, rather than assaulting two adult males at the same time. Thus, Mr. LeBlanc, who was accosted first, was alone and distracted when defendant suddenly attacked him. Additionally, defendant covered Mr. LeBlanc's mouth in an attempt to keep him from calling for help. After Mr. Legendre approached defendant, defendant attacked him, but stopped when he saw Mr. LeBlanc looking in his truck, at which point he realized that Mr. LeBlanc was trying to get a gun. Defendant knew that he had to disarm Mr. LeBlanc in order to save his own life. Additionally, defendant fired the gun at Mr. LeBlanc twice, re-firing after his initial misfire. We further note that defendant disposed of the weapons used in the offenses prior to being found by the police. See **Mitchell**, 231 So.3d at 735. Defendant was very calm when he was approached by the police and cooperative during his arrest. After his arrest, defendant was aware that he had the right to not answer questions and had a right to counsel. Moreover, he recalled his actions at the time of the offenses. Defendant calmly provided a detailed account of the incident that was consistent with the evidence obtained by the police, although he later gave a less culpable version of the events. Based on defendant's actions at the time of the offenses and statements in the interview shortly after the offenses, the jury could have rationally inferred that defendant was thinking clearly and understood his actions. In light of the evidence, the jury could have rationally

14

concluded that defendant failed to prove that he did not know the difference between right and wrong at the time that he attacked Mr. LeBlanc and Mr. Legendre.

Thus, we find that based on the totality of the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found that defendant did not prove by a preponderance of the evidence that he was insane at the time of the offenses. Louisiana does not recognize the defense of diminished capacity. A mental disease or defect short of insanity cannot serve to negate an element of the crime. **State v. Hebert**, 2010-0305 (La.App. 1 Cir. 2/11/11), 2011 WL 2119755, *3 (unpublished), writ denied, 2011-0864 (La. 10/21/11), 73 So.3d 380. Accordingly, defendant's criminal responsibility was not negated by the existence of a mental disease or defect. In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Ordodi**, 946 So.2d at 662.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of attempted second degree murder and second degree battery. Accordingly, we find no abuse of discretion or error in the trial court's denial of the defendant's combined motion for new trial and motion for post-verdict judgment of acquittal. Further, we find no merit in assignments of error numbers one, three, and four.

## EXCESSIVE SENTENCE

In assignment of error number two, defendant argues that the trial court imposed excessive sentences that should have been reserved for the most egregious offenders, stating that a maximum sentence was imposed on count two. He thus contends, in assignment of error number five, that the trial court erred in denying his motion to reconsider sentence.

15

The Eighth Amendment to the United States Constitution and Article I, § 20, of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. Although a sentence falls within statutory limits, it may be excessive. **State v. Sepulvado**, 367 So.2d 762, 767 (La. 1979). A sentence is considered constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. **State v. Livous**, 2018-0016 (La.App. 1 Cir. 9/24/18), 259 So.3d 1036, 1044, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130.

The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. **State v. Scott**, 2017-0209 (La.App. 1 Cir. 9/15/17), 228 So.3d 207, 211, writ denied, 2017-1743 (La. 8/31/18), 251 So.3d 410. Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of LSA-C.Cr.P. art. 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. **Id.**

The sentencing court should review the defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. **State v. Spikes**, 2017-0087 (La.App. 1 Cir. 9/15/17), 228 So.3d 201, 204-05. On appellate review of a sentence, the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. **Id.**

The sentencing range for attempted second degree murder is ten years to fifty years imprisonment at hard labor. LSA-R.S. 14:27(D); LSA-R.S. 14:30.1(B). Second degree battery carries a maximum sentence of eight years with or without hard labor and/or a fine of up to $2,000.00. LSA-R.S. 14:34.1(C). Thus, in this case, in sentencing defendant to five years on count two, the trial court did not impose a maximum sentence.

Further, the five-year sentence on count two is to be served concurrent to the sentence imposed on count one, a mid-range sentence of twenty-five years.

At the sentencing hearing, the trial court noted that defendant created a risk of death or great bodily harm to more than one person and used actual violence or brutality in committing the offenses. See LSA-C.Cr.P. art. 894.1(B)(5) & (6). The trial court recalled specific facts of the offense on count one, noting that defendant got on top of Mr. LeBlanc and stabbed him in the face multiple times with a kitchen knife before wrestling his gun away and firing it at him. See LSA-C.Cr.P. art. 894.1(B)(10). The trial court stated that the attack was extremely brutal and that Mr. LeBlanc had remaining scars on his face from the injuries. The trial court noted that the testimony presented at trial further established long-lasting emotional trauma by Mr. LeBlanc. See LSA-C.Cr.P. art. 894.1(B)(9). Further, the trial court noted that defendant had not shown any remorse. See LSA-C.Cr.P. art. 894.1(B)(21). However, the trial court considered defendant's mental issues as a mitigating factor. As additional mitigating factors, the trial court noted that defendant did not have a criminal history and had strong family support. See LSA-C.Cr.P. art. 894.1(B)(28) & (33). Considering the facts of the offenses and the trial court's reasons for imposing the sentences, we find the sentences imposed are not grossly disproportionate to the severity of the offenses, and therefore, are not unconstitutionally excessive. Thus, we find no error in the trial court's denial of defendant's motion to reconsider sentence. Assignments of error numbers two and five are without merit.

## CONCLUSION

Accordingly, we affirm defendant's convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED.**

17