STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2024 KA 0258

STATE OF LOUISIANA

VERSUS

ROGELIO LEDEZMA

JUDGMENT RENDERED:   **DEC 2 7 2024**

* * * * * * *

Appealed from the Seventeenth Judicial District Court
Parish of Lafourche • State of Louisiana
Docket Number C-609101 • Division E

The Honorable F. Hugh LaRose, Presiding Judge

* * * * * * *

Sherry Watters
*Louisiana Appellate Project*
New Orleans, Louisiana

COUNSEL FOR APPELLANT
DEFENDANT—Rogelio Ledezma


Kristine Russell
*District Attorney*
Joseph S. Soignet
Shaun George
Alissa Lebouef
*Assistant District Attorneys*
Thibodaux, Louisiana

COUNSEL FOR APPELLEE
State of Louisiana

* * * * * * *

BEFORE: MCCLENDON, WELCH, AND LANIER, JJ.

**WELCH, J.**

The grand jury of Lafourche Parish charged the defendant, Rogelio Ledezma, by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. The defendant initially pled not guilty. He later changed his plea to not guilty and not guilty by reason of insanity. Upon motion of the defendant, the trial court appointed a sanity commission to determine the defendant's competency to stand trial. After a sanity hearing, the sanity commission found the defendant competent to stand trial. Following a jury trial, the jury convicted the defendant guilty as charged by unanimous verdict. The defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial. The trial court denied both motions. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The trial court subsequently denied the defendant's motion to reconsider sentence. The defendant now appeals, designating three assignments of error. For the following reasons, we affirm the defendant's conviction and sentence and remand for amendment of the commitment order.

## BACKGROUND

On October 4, 2021, Tabitha Summers reported to the Lafourche Parish Sheriff's Office ("LPSO") in Cut Off, Louisiana that she witnessed the defendant shoot her boyfriend, Beau Plaisance, in the head. Officers with the LPSO and the Louisiana State Police immediately responded to and secured the scene, which was a residence located several houses away from the sheriff's office. Officers conducted a search of the residence and discovered the body of the victim near the back door. During a secondary search of the residence, law enforcement officers apprehended the defendant as he climbed down from where he had been hiding in the attic and arrested him. Once in custody, the defendant provided a voluntary statement to the police.

## ASSIGNMENTS OF ERROR ONE AND TWO

In his first assignment of error, the defendant asserts the evidence presented at trial was insufficient to support his second degree murder conviction; therefore, the defendant argues he should have been convicted of the responsive verdict of manslaughter. In his second assignment of error, the defendant argues he proved by a preponderance of the evidence that he was insane at the time of the offense, requiring a verdict of not guilty by reason of insanity.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2; **State v. Jacquot**, 2023-1254 (La. App. 1 Cir. 6/27/24), 392 So.3d 663, 667, writ denied, 2024-00979 (La. 11/20/24), ___ So.3d ___, 2024 WL 4830759. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Welch**, 2019-0826 (La. App. 1 Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

The **Jackson** standard of review, incorporated in La. Code Crim. P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **Welch**, 297 So.3d at 27. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the

3

crime. **State v. Coleman**, 2021-0870 (La. App. 1 Cir. 4/8/22), 342 So.3d 7, 12, <u>writ</u> <u>denied</u>, 2022-00759 (La. 11/21/23), 373 So.3d 460.

When analyzing circumstantial evidence, La. R.S. 15:438 provides the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Southall**, 2022-0746 (La. App. 1 Cir. 6/2/23), 369 So.3d 925, 930, <u>writ denied</u>, 2023-00875 (La. 2/6/24), 378 So.3d 750.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances.[1] Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **State v. Currie**, 2020-0467 (La. App. 1 Cir. 2/22/21), 321 So.3d 978, 983.

The responsive verdict of manslaughter is defined under La. R.S. 14:31(A)(1), in pertinent part, as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a

---

[1] Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **Southall**, 369 So.3d at 930.

4

homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are mitigating factors which the defendant must establish by a preponderance of the evidence. See **State v. Dearmas**, 2022-0494 (La. App. 1 Cir. 11/4/22), 356 So.3d 9, 14, writ denied, 2022-01839 (La. 5/23/23), 360 So.3d 1254; **State v. Mellion**, 2021-1116 (La. App. 1 Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022). If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. **Mellion**, 342 So.3d at 48. Provocation and time for cooling off are determinations made by the trier of fact under the standard of the ordinary person with ordinary self-control. **Dearmas**, 356 So.3d at 15. Thus, an appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors had not been established by a preponderance of the evidence. See **Dearmas**, 356 So.3d at 18.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Bessie**, 2021-1117 (La. App. 1 Cir. 4/8/22), 342 So.3d 17, 23, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802. Provocation testimony is an issue of credibility. **Mellion**, 342 So.3d at 47. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. **Bessie**, 342 So.3d at 23.

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. La. R.S. 15:432; **State v. Garnett**, 2023-0699 (La. App. 1 Cir. 2/21/24), 384 So.3d 384, 391, writ denied, 2024-00360 (La. 11/20/24), ___ So.3d ___, 2024 WL 4830733. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La. R.S. 15:432; La. Code Crim. P. art. 652; **Garnett**, 384 So.3d at 391. Criminal responsibility is not negated by the mere existence of a mental disease or defect. **Garnett**, 384 So.3d at 391. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; **Garnett**, 384 So.3d at 391. The determination of sanity is a factual matter. **State v. Mitchell**, 2016-0834 (La. App. 1 Cir. 9/21/17), 231 So.3d 710, 732, writ denied, 2017-1890 (La. 8/31/18), 251 So.3d 410. The most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime. **Mitchell**, 231 So.3d at 735.

The State is not required to offer any proof of the defendant's sanity or to offer evidence to rebut the defendant's evidence. Instead, the determination of whether the defendant's evidence successfully rebuts the presumption of sanity is made by the trier of fact viewing all the evidence, including lay and expert testimony, the conduct of the defendant, and the defendant's actions in committing the particular crime. Lay testimony concerning the defendant's actions, both before and after the crime, may provide the jury with a rational basis for rejecting even unanimous medical opinion that a defendant was legally insane at the time of the offense. **Garnett**, 384 So.3d at 391. When a defendant who affirmatively offered the defense of insanity claims the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by the appellate court is whether or not

6

any rational factfinder, viewing the evidence in the light most favorable to the prosecution, could conclude the defendant had not proved by a preponderance of the evidence he was insane at the time of the offense. **Garnett**, 384 So.3d at 391.

At trial, Tabitha Summers, the girlfriend of Beau Plaisance (the victim) at the time of the incident, testified that she was living at the Plaisance residence in October 2021.[2] Summers denied that Plaisance was verbally, physically, or sexually abusive to her or her children. According to Summers, Plaisance was a drug user, and she had seen him last use drugs "[p]robably that morning." Summers testified she was friends with the defendant (who she called "Xavier") and smoked methamphetamine with him once. The night prior to the incident, the defendant was visiting the Plaisance residence and thought he heard a noise in the attic. The defendant armed himself with a shotgun to check it out. Summers testified she woke up around ten o'clock the next morning. While she was cooking breakfast, the defendant came to the Plaisance residence to talk to her. Summers testified the defendant appeared normal that morning, but later, the defendant approached her wearing a camouflage hat and jacket, a blue wig, her work gloves, and her son's shoes. Summers testified the defendant told her to be quiet and repeatedly said Plaisance's name. Then, Plaisance entered the room and, according to Summers:

> Beau looks at [the defendant] and says, dude, what you doing? That's my gun. And he walks towards [the defendant] and [the defendant is] fumbling with the gun and normally the -- none of the guns were on safety. I'm not sure why this one was at this time. You could see him fumbling trying to press the trigger three or four times real quick[,] and it doesn't go off till he looks down. And when he looks down, Beau grabs the barrel of the gun and points it at the wall and next thing I know, the gun goes off.

Summers testified she saw Plaisance on the floor. She asked the defendant why he shot Plaisance, to which the defendant responded, "[B]ecause of what Beau

---

[2] The residents of the Plaisance home included the victim, Beau Plaisance, and his daughter, Charlie; Tabitha Summers and her children, Moet and Hayden; and Beau's father, Thomas "Zambo" Plaisance, who owned the residence.

was doing to y'all." Summers said she and her son ran to the LPSO. Summers testified Plaisance did not attack the defendant, nor did he have a weapon.

Deputy Brandon Baudoin, a patrol deputy and SWAT team member with the LPSO, testified he responded to the scene within five to ten minutes of the complaint and established a perimeter to ensure no one left the scene.[3] An initial search of the residence revealed Plaisance's body near the partially opened back door. The SWAT team performed a secondary search of the house after failing to locate a suspect, at which point the defendant climbed down from the attic.

Sergeant Terry Poincot, a detective with the LPSO, testified he was the crime scene investigator in this case. Sergeant Poincot testified he noticed a gun cabinet was partially opened, and a shotgun with apparent blood stains was placed haphazardly inside the cabinet, unlike the other guns. According to Sergeant Poincot, Plaisance's body had been moved from where he was killed due to the presence of drag marks and blood smears leading to the back door. Sergeant Poincot testified that while he was processing the scene, the defendant climbed down from the attic and was taken into custody.

Sergeant Gerard Lotz, a detective with the LPSO, advised the defendant of his **Miranda**[4] rights and interviewed the defendant after he waived his rights. An audio recording of the interview and a transcription of the interview were published to the jury. In the interview, the defendant admitted to shooting Plaisance. The defendant said that after he shot Plaisance, he put the gun back in the gun cabinet and moved the victim's body towards the back door because he planned to bury him.

---

[3] Baudoin was a detective with the LPSO at the time of the trial.

[4] Under **Miranda v. Arizona**, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), prior to any questioning by law enforcement officers, a person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently.

Dr. Dana Troxclair, accepted as an expert in forensic pathology, testified she performed Plaisance's autopsy on October 5, 2021. Plaisance died from a single shotgun wound to the head. Dr. Troxclair's autopsy report indicated the firearm was fired near Plaisance as there were seared edges and soot surrounding the wound. Toxicology analysis revealed high levels of methamphetamine and amphetamine in Plaisance's system.

The defense called Linda Sue Lassagne, the defendant's grandmother, who testified about his history with mental illness and narcotics. Lassagne said the defendant had been diagnosed with schizophrenia, bipolar disorder, and manic depression. She testified she was afraid of the defendant's violent tendencies and outbursts. Lassagne said the defendant had been hospitalized for nearly overdosing and attempting suicide.

Dr. Sarah DeLand, accepted as an expert in forensic psychiatry, testified that she was a psychiatrist on the sanity commission who examined the defendant at the court's request. Dr. DeLand's examination of the defendant took place in September 2022, almost a year after the offense. Dr. DeLand reviewed medical records from Lady of the Sea, St. Anne, and St. Charles Parish Hospitals. She testified the hospital records revealed that the defendant had suicidal ideation and paranoia. According to Dr. DeLand, the defendant suffered from substance-induced psychotic disorder and substance-induced bipolar disorder, though she could not rule out underlying psychotic or bipolar disorders. Dr. DeLand testified mental illnesses wax and wane and psychosis occurs in episodes. With respect to the defendant, Dr. DeLand testified the offense "was likely motivated by psychotic symptoms in the form of paranoid delusions and that ... could cause him to have problems distinguishing right from wrong." The defendant was thereafter convicted of second degree murder by a unanimous jury.

## Responsive Verdict of Manslaughter

On appeal, the defendant asserts the responsive verdict of manslaughter should be entered as the killing was committed in the heat of blood. Specifically, he argues "there was a tussle over a shotgun that [the defendant] brought out as an impulsive act in the heat of the situation, due to his delusion that the others were in need of protection."

A reduction of second degree murder to manslaughter requires the killing be "committed in sudden passion or heat of blood *immediately* caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31(A)(1) (emphasis added). There was no allegation that Plaisance threatened physical harm to the defendant or others. Though the defendant indicated he shot Plaisance to protect Summers and her children, Summers denied at trial that Plaisance was ever verbally, physically, or sexually abusive to her or her children. Nothing in the moments leading up to the shooting established the defendant had been provoked by Plaisance to the extent that a reasonable person in the defendant's position would have lost his self-control. See **State v. Tran**, 98-2812 (La. App. 1 Cir. 11/5/99), 743 So.2d 1275, 1292, writ denied, 99-3380 (La. 5/26/00), 762 So.2d 1101. Rather, the evidence showed the defendant armed himself with a shotgun before confronting Plaisance. The defendant pointed the shotgun at Plaisance and pulled the trigger several times before removing the safety to fire the fatal shot at Plaisance's head.

The jury's verdict reflects that it clearly found the defendant failed to meet his burden of proving the mitigating factors by a preponderance of the evidence. See **Dearmas**, 356 So.3d at 18. We find that the jury's determination was not irrational based on the evidence presented at trial. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the trier of fact and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence

10

presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter.

## Not Guilty by Reason of Insanity

We next address the defendant's argument that he proved his insanity at the time of the offense by a preponderance of the evidence, requiring a verdict of not guilty by reason of insanity. The defendant notes the State did not offer any proof, much less any expert witness, to refute Dr. DeLand's testimony at trial. The State was not required to offer expert testimony to rebut the defendant's evidence of insanity, as lay testimony may provide a rational basis for rejecting an expert opinion. See **State v. Harris**, 99-0820 (La. App. 1 Cir. 2/18/00), 754 So.2d 304, 308. However, the defendant argues Summers' testimony corroborated his claim of insanity.

As discussed, the defendant had the burden of proving by a preponderance of the evidence that he was insane at the time of the offense. See La. R.S. 15:432; La. Code Crim. P. art. 652; **Garnett**, 384 So.3d at 391. We find the defendant did not meet that burden of proof. Undoubtedly, the defendant has experienced some mental health issues and has been treated for such in the past. He has likewise had issues with substance abuse.[5] Nevertheless, the mere existence of mental defect or disease does not equate automatically to insanity. See **Mitchell**, 231 So.3d at 732.

---

[5] While a defendant's voluntary intoxication may be asserted as a defense "[w]here the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime" pursuant to La. R.S. 14:15(2), "[i]t is, however, an affirmative defense, and the burden is on [the] defendant to prove by a preponderance of the evidence that he was in fact intoxicated at the time of the offense." **State v. Mack**, 45,552 (La. App. 2 Cir. 8/11/10), 46 So.3d 801, 803. No such affirmative defense was pleaded or presented here.

Considering Dr. DeLand's testimony as a whole and all of the other testimony presented at trial, we cannot say the jury was irrational in rejecting Dr. DeLand's opinion. See **State v. Thames**, 95-2105 (La. App. 1 Cir. 9/27/96), 681 So.2d 480, 487, writ denied, 96-2563 (La. 3/21/97), 691 So.2d 80. The most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime. See **State v. Armstrong**, 94-2950 (La. 4/8/96), 671 So.2d 307, 313. The defendant in this case went to great lengths to attempt to cover up his crime. After shooting and killing Plaisance, the defendant placed the shotgun back in the gun cabinet and moved Plaisance's body in an attempt to hide it. The defendant admitted his intention was to bury the body, but he was unable to do so before the police arrived. When the police arrived on the scene, the defendant hid in the attic to avoid detection. All of these actions, designed to conceal and misdirect, clearly indicated the defendant knew killing Plaisance was wrong. See **Mitchell**, 231 So.3d at 735-36. Furthermore, after being taken into custody, the defendant was aware of his rights, specifically stating that he had the right to not answer questions and, moreover, was aware of his actions at the time of the offense. The defendant eventually provided a detailed account of the incident that was consistent with the evidence obtained by the police.

Based on the defendant's actions at the time of the offense and statements in the interview shortly thereafter, the jury could have rationally inferred the defendant was thinking clearly and understood his actions. In light of the evidence, the jury could have rationally concluded the defendant failed to prove that he did not know the difference between right and wrong at the time of the murder. Thus, we find that based on the totality of the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the defendant did not prove by a preponderance of the evidence that he was insane at the time of the offense. Louisiana does not recognize the defense of diminished capacity. A mental disease

or defect short of insanity cannot serve to negate an element of the crime. **State v. Hebert**, 2010-0305 (La. App. 1 Cir. 2/11/11), 2011 WL 2119755, *3 (unpublished), writ denied, 2011-0864 (La. 10/21/11), 73 So.3d 380. Accordingly, the defendant's criminal responsibility was not negated by the mere existence of a mental disease or defect. In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See **Ordodi**, 946 So.2d at 662. Accordingly, these assignments of error are without merit.

## ASSIGNMENT OF ERROR THREE

In his third assignment of error, the defendant argues his life sentence is excessive. The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana State Constitution prohibit the imposition of cruel or excessive punishment. Although a sentence falls within statutory limits, it may be excessive. See **State v. Sepulvado**, 367 So.2d 762, 767 (La. 1979). A sentence is considered unconstitutionally excessive if it is grossly disproportionate to the severity of the offense or constitutes nothing more than a needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. **State v. Livous**, 2018-0016 (La. App. 1 Cir. 9/24/18), 259 So.3d 1036, 1044, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130.

Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of La. Code Crim. P. art. 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. **State v. Spikes**, 2017-0087 (La. App. 1 Cir. 9/15/17), 228 So.3d 201, 204. The sentencing judge should review the defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation

through correctional services other than confinement. **Spikes**, 228 So.3d at 204-05. On appellate review, the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. **Spikes**, 228 So.3d at 205.

For the defendant's conviction of second degree murder, the trial court imposed the mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. See La. R.S. 14:30.1(B). In his brief to this court, the defendant argues the trial court imposed an excessive sentence that should be reserved for the most egregious offenders. The defendant further suggests the trial court gave no consideration to his mental health, tumultuous childhood, and lack of criminal record. According to the defendant, the trial court failed to consider whether the mandatory life sentence was appropriate under the particular circumstances of this case.

In **State v. Dorthey**, 623 So.2d 1276, 1280 (La. 1993), the Louisiana Supreme Court opined that a trial court would be duty bound to reduce a sentence if the punishment mandated by the Habitual Offender Law makes no measurable contribution to acceptable goals of punishment. Should the trial court find the prescribed sentence amounted to nothing more than the purposeful imposition of pain and suffering and was grossly out of proportion to the severity of the offense, the trial court had the option, indeed the duty, to reduce the sentence imposed to one that would not be constitutionally excessive. See **Dorthey**, 623 So.2d at 1280-81.

In **State v. Johnson**, 97-1906 (La. 3/4/98), 709 So.2d 672, 676-77, the Louisiana Supreme Court examined the issue of when **Dorthey** permits a downward departure from a mandatory minimum sentence under the Habitual Offender Law. The **Johnson** court held that to rebut the presumption that a mandatory minimum sentence was constitutional, the defendant must clearly and convincingly show that he is exceptional. That is, because of unusual circumstances, this defendant is a

14

victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. **Johnson**, 709 So.2d at 676.

While **Dorthey** and **Johnson** involve the mandatory minimum sentences imposed under the Habitual Offender Law, the Louisiana Supreme Court has held the sentencing review principles espoused in **Dorthey** are not restricted in application to the penalties provided by La. R.S. 15:529.1. See **State v. Fobbs**, 99-1024 (La. 9/24/99), 744 So.2d 1274, 1275 (*per curiam*); **State v. Collins**, 2009-1617 (La. App. 1 Cir. 2/12/10), 35 So.3d 1103, 1108, writ denied, 2010-0606 (La. 10/8/10), 46 So.3d 1265.

Mandatory sentences have been upheld repeatedly as constitutional and consistent with the federal and state constitutional provisions prohibiting cruel, unusual, or excessive punishment. See **State v. Scott**, 2017-0209 (La. App. 1 Cir. 9/15/17), 228 So.3d 207, 212, writ denied, 2017-1743 (La. 8/31/18), 251 So.3d 410. There is no need for a trial court to conduct a presentence investigation or to justify a sentence under La. Code Crim. P. art 894.1 by considering aggravating or mitigating circumstances when imposing a mandatory life sentence. **State v. Griffin**, 2021-452 (La. App. 3 Cir. 3/3/22), 351 So.3d 385, 390, writ denied, 2022-00600 (La. 6/1/22), 338 So.3d 496. Articulating such reasons or factors would be an "exercise in futility since the court has no discretion." **Griffin**, 351 So.3d at 390, citing **State v. Eley**, 2015-1925 (La. App. 1 Cir. 9/16/16), 203 So.3d 462, 475-76, writ denied, 2016-1844 (La. 9/6/17), 224 So.3d 982.

We find there is nothing particularly unusual about the defendant's circumstances that would justify a downward departure from the mandatory sentence under La. R.S. 14:30.1(B). The defendant has not shown by clear and convincing evidence that he is exceptional such that a mandatory life sentence would not be meaningfully tailored to the culpability of the offender, the gravity of the offense,

and the circumstances of the case. See **Johnson**, 709 So.2d at 676. Accordingly, no downward departure from the presumptively constitutional mandatory life sentence is warranted. The sentence imposed is not grossly disproportionate to the severity of the offense and, therefore, is not unconstitutionally excessive. This assignment of error is without merit.

## PATENT ERRORS

Pursuant to La. Code Crim. P. art. 920(2), this court routinely conducts a review of all appeals for errors discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117 (La. App. 1 Cir. 11/3/23), 378 So.3d 766, 775, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242. After a careful review of the record, we have found two patent errors.

First, the transcript reflects the trial court ordered the sentence to be served without the benefit of parole, probation, or suspension of sentence as required under La. R.S. 14:30.1(B). Although the minutes of sentencing correctly reflect the sentences were ordered to be served without benefits, the commitment order does not so provide.[6] Therefore, we instruct the trial court to amend the commitment order to accurately reflect the sentence is to be served without the benefit of parole, probation, or suspension of sentence and to transmit a corrected commitment order to the Louisiana Department of Corrections Legal Department. See **State v. Grayer**, 2018-1346 (La. App. 1 Cir. 6/3/19), 2019 WL 2352298, *3 (unpublished).

The transcript further reflects the trial court failed to advise the defendant of the prescriptive period for filing an application for post-conviction relief. Louisiana Code of Criminal Procedure article 930.8(C) directs the trial court to inform the defendant of the prescriptive period for filing an application for post-conviction

---

[6] When there is a discrepancy between the minutes and/or commitment order and the transcript, the transcript prevails. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).

16

relief at the time of sentencing. <u>See</u> **State v. LeBoeuf**, 2006-0153 (La. App. 1 Cir. 9/15/06), 943 So.2d 1134, 1142, <u>writ denied</u>, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Nevertheless, the trial court's failure to advise the defendant of the prescriptive period has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. Out of an abundance of caution and in the interest of judicial economy, we advise the defendant that La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **LeBoeuf**, 943 So.2d at 1142-43.

## CONCLUSION

Based on the foregoing, we affirm the defendant's conviction and sentence. We remand to the trial court to correct the commitment order to reflect that the defendant's sentence of life imprisonment at hard labor is to be served without the benefit of parole, probation, or suspension of sentence. We advise the defendant that La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922.

## DECREE

### CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR CORRECTION OF THE COMMITMENT ORDER.